UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION


MAIGAN FRANCIS            :    CIVIL ACTION NO.
                         :    5:19-CV-14315
                         :
VERSUS                   :    SECTION: A/2
                         :
                         :
AMERICAN FEDERATION      :    DISTRICT JUDGE JAY C.
FOR CHILDREN, INC.       :    ZAINEY


VIDEO REMOTE DEPOSITION OF KELLI D. BOTTGER
January 14, 2021


Stenographically Reported by:
Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
Registered Diplomate Reporter
Notary Public

KELLI D. BOTTGER                    01/14/2021

2

```
 1    REMOTE APPEARANCES:

 2        COUNSEL FOR PLAINTIFF:

 3        LANGLEY & PARKS, LLC
          BY:     JULIANNA P. PARKS, ESQUIRE
 4                jparks@langleyparks.com
          401 Market Street, Suite 1100
 5        Shreveport, Louisiana  71101
          318.383.6422
 6        318.383.6405 - Facsimile

 7        COUNSEL FOR DEFENDANT:

 8        CENTRE LAW & CONSULTING, LLC
          BY:     TYLER J. FREIBERGER, ESQUIRE
 9                tfreiberger@centrelawgroup.com
          8330 Boone Boulevard
10        Vienna, Virginia  22182
          703.288.2800

11

12        VIDEOGRAPHER:  Mr. Bobby Bryant

13        ALSO PRESENT:  Ms. Maigan Francis

14

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///
```

3

1                    S T I P U L A T I O N S

2

3          The video remote deposition of KELLI D.

4    BOTTGER, taken by counsel for Plaintiff,

5    Ms. Julianna P. Parks, pursuant to Notice and

6    agreement by and between counsel, for all purposes as

7    allowed by the Federal Rules of Civil Procedure,

8    before Karen Tyler, Certified Court Reporter, with the

9    parties being in Louisiana and Virginia, on

10   January 14, 2021.  It being stipulated by and between

11   counsel that all formalities, with the exception of

12   the swearing of the witness, are waived.

13          It being further stipulated that the reading

14   and signing of the deposition are waived by counsel

15   and by the witness.

16          It being further stipulated that all

17   objections, except as to the form of the question and

18   responsiveness of the answer, are reserved until the

19   time of trial.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

23

1  37397 Cypress Alley Avenue, Gonzales, Louisiana 70737.

2      Q.  All right.  What is your work email address

3  that you're currently using?

4      A.  kbottger@federationforchildren.org.

5      Q.  Have you ever been sued?

6      A.  No, ma'am.

7      Q.  Have you ever been involved in any lawsuit as

8  a witness or a plaintiff or any other party?

9      A.  No, ma'am.

10      Q.  Have you ever testified in court?

11      A.  No, ma'am.

12      Q.  All right.  And you are currently employed

13  with AFC; is that correct?

14      A.  Yes, ma'am.

15      Q.  And what is the title of your position?

16      A.  I'm a regional government affairs director.

17      Q.  Okay.  Can you tell me a little bit about

18  what that involves?

19      A.  Yes, ma'am.  So I specialize in electoral

20  work and government affairs work, such as lobbying.  I

21  have both the State of Louisiana as well as the State

22  of Texas.  And so I try and build coalitions.  I

23  obviously oversee all work in Louisiana, and then I

24  assist in the work in Texas.  We recently just

25  conducted some elections there.

KELLI D. BOTTGER                                01/14/2021

44

1      Q.   Okay.  And what was your husband's name?

2      A.   His official name is Justin Blake Bottger.

3      Q.   Okay.  And what about your first husband?

4      A.   I cannot remember his middle name, but it's

5   Eric Lee was his.

6      Q.   How do you spell Lee?

7      A.   L-e-e.

8      Q.   And did you have any children in that first

9   marriage?

10     A.   No, ma'am.

11     Q.   Okay.  And your second marriage, did you have

12  any children?

13     A.   One son, yes, ma'am.

14     Q.   Okay.  What -- what is his birthday?

15     A.   3/18 of '11.

16     Q.   I have a son born in '11 too.  Let's see.

17  All right.  And do you have custody of your son right

18  now, now that you are separated or divorced?

19     A.   I have 50/50 custody.

20     Q.   50/50.

21     A.   If that counts.

22     Q.   Okay.  And can you tell me how that works?

23  Is it week on, week off?  Weekends?

24     A.   Week on, week off.

25     Q.   Okay.  So your ex-husband lives somewhere

45

1   near you?

2        A.  Yes, ma'am.  Like within a mile.

3        Q.  So your son is almost ten.

4        A.  Yes, ma'am.

5        Q.  And what is the name of your fiance?

6        A.  Joseph Nicholas Danehower.

7        Q.  Can you spell that last name?

8        A.  D-a-n-e-h-o-w-e-r.

9        Q.  And does he have any children?

10       A.  Yes, ma'am.  One daughter.

11       Q.  And how old is she?

12       A.  Ten.

13       Q.  Okay.  So you said you got divorced in 2018,

14  January of 2018; is that correct?

15       A.  I think that's right.  I honestly would have

16  to look at the paperwork.

17       Q.  Do you know --

18       A.  Because I know I filed in -- It has to be

19  '18, I think.

20       Q.  Do you know when you were separated?

21       A.  It was August, I think, of 2016.

22       Q.  Okay.  And did you immediately start this

23  week on/week off custody, or how did it work?

24       A.  Yes, ma'am.

25       Q.  So that's been the custody arrangement since

KELLI D. BOTTGER                    01/14/2021

46

1   your separation.

2       A.  Yes, ma'am.

3       Q.  So where did you work when your son was born?

4       A.  Well, for the first six months of his life, I

5   was teaching at Dutchtown Primary School.

6       Q.  Okay.

7       A.  And then I transferred and took the job at

8   the Associated Professional Educators of Louisiana.

9       Q.  Okay.  And so that would have been in

10  September of '11?

11      A.  It was in February of -- it was in February

12  of 2012.

13      Q.  Okay.  So did you work at Dutchtown Primary

14  until then?

15      A.  Yes, ma'am.  So I think my maternity leave

16  started in March, and I went back in August.  So I

17  taught from August to February with Riley -- right? --

18  August, September, October, November, December,

19  January -- oh, seven months.  I'm sorry.  Not six.

20      Q.  Okay.  So from March to August, you were home

21  with the child?

22      A.  Yes, ma'am.

23      Q.  And did you do any other work during that

24  time?  Any other side jobs or --

25      A.  No, ma'am.

47

1    Q.  All right.  Now we're going to switch gears a

2  little bit.

3        Tell me about your impressions of Maigan

4  Francis.

5    A.  Can you clarify the question?

6    Q.  I mean, let's just -- if you had to describe

7  her in a few sentences, what would you say?

8    A.  Are we talking about work or personality?

9    Q.  Whatever comes to your mind first.  If

10  somebody said, do you know Maigan Francis, what -- how

11  would you respond?

12    A.  I would say yes, I know her.  She's a really

13  nice girl.

14    Q.  Okay.  Personality-wise, how would you

15  describe her?

16    A.  She's nice.  She's laid back for most

17  account.

18    Q.  Is she a tough personality to work with?

19    A.  It depends on the situation.

20    Q.  Okay.  So what situation would she be an easy

21  person to work with?

22    A.  As long as everything was fine and you agreed

23  on work that needed to be done, it was fine to work

24  with her.

25    Q.  Okay.  And when would be a situation when she

KELLI D. BOTTGER                                    01/14/2021

48

1   wasn't fine to work with?

2       A.  If she didn't like your decision, she would

3   push back, be insubordinate in those cases, and try

4   and change and continue to ask you until you changed

5   your decision.

6       Q.  And can you give me an example of that?

7       A.  Yes, ma'am.  So there was a Catholic

8   conference that we were short on funding that year,

9   and Paul and I had sat and met with Maigan and told

10  her that because of budget constraints that only one

11  person could go to this conference.  And so in person,

12  we told her, please just go on your own.  Do not take

13  staff.  Because in previous years, they had taken two

14  or three staff members, and it did put a drain on the

15  team because it was in Biloxi.

16          And at the meeting she said, okay, no big

17  deal.  But then I received subsequent texts and emails

18  asking me to reconsider, and when I wouldn't

19  reconsider, she did it anyway and brought a staff

20  member, which was not my directions to her in multiple

21  conversations.

22      Q.  Okay.  So did the -- did AFC pay for it, even

23  though it wasn't authorized?

24      A.  So it was authorized for her to attend.  It

25  was not authorized for her to bring a staffer.  And

KELLI D. BOTTGER                           01/14/2021

49

1    yes, we ended up, through our credit card, because it

2    was authorized for her to go, ended up paying for the

3    other staffer as well, because I didn't know until

4    afterwards she disregarded my instructions and Paul's

5    instructions and took the staffer anyway.

6        Q.  So what were the additional charges due to

7    the staffer going along?

8        A.  I don't know.  I'd have to go back and look

9    that up.  But it was obviously a hotel room and food.

10       Q.  Okay.  So the hotel room is not going to cost

11   any more by having the -- was it an extra hotel room?

12       A.  Yes, ma'am.

13       Q.  Okay.

14       A.  Everybody stays in separate rooms.

15       Q.  Okay.  So AFC paid for a separate hotel room?

16       A.  Yes, ma'am.

17       Q.  And additional meals?

18       A.  Yes, ma'am.

19       Q.  Even though it wasn't authorized?

20       A.  Yes, ma'am.  Because it wasn't that staffer's

21   fault for going, because she didn't know that we had

22   said do not go.  So you can't penalize a staffer for

23   another staffer's insubordination.

24       Q.  What year did that happen?

25       A.  I think that was in 2018.  I'd have to rely

1  of summer and goes through the end of January for the

2  simple fact is, we do parent satisfaction surveys

3  during that time.  We have the marketing campaign that

4  always starts during that time.  And so it's customary

5  for us to start planning in July for the big

6  implementation push.

7       Q.  Okay.  So tell me the kind of things that you

8  went over in this meeting.

9       A.  So in this meeting, we gave her a list of

10  spreadsheets.  We gave her three different

11  spreadsheets of what kind of information we wanted.

12  So a list of schools, principals, intake --

13  information that we needed if we were going to do

14  Maigan's job while she was out on maternity leave.

15  Because obviously implementation can't stop.  And so

16  our team, we're a good team; we're like a family; we

17  were going to pick up and do her work while she was

18  out.  And so we needed her to give us these

19  spreadsheets that we had always created beforehand to

20  make those calls, et cetera, et cetera.

21           We also asked her to find out information

22  from the Department of Education because she's the

23  main contact in her role with the Department of

24  Education.  And during that meeting, she opened her

25  laptop several times and wrote emails or had me

KELLI D. BOTTGER                              01/14/2021

71

1   dictate what the email should say to the Department of
2   Ed.  It was also learned in that email -- in that
3   meeting that, even though she had been on staff since
4   February of 2016, it was July 3rd of 2018, and she was
5   still emailing a form email rather than emailing Olin
6   Parker or calling him.  She had been provided that
7   information multiple times.  And it was abundantly
8   clear in that meeting that she did not fully
9   understand her job and what that entailed and maybe
10  wasn't capable of doing her job, because she wrote
11  emails, had me dictate emails, that she should send to
12  the Department of Ed during that meeting.  But it was
13  mainly to go over a timeline of what needed to be done
14  as an implementation director and giving us the data
15  we need to do her job while she was on maternity
16  leave.
17       Q.  Did you provide her with a written form of
18  the timeline that you anticipated?
19       A.  It was in the agenda, yes, ma'am.
20       Q.  Did she --
21       A.  You know, for that Monday.
22       Q.  -- seem like she was receptive and trying to
23  do what you told her to do?
24       A.  Yes, ma'am.
25       Q.  Okay.  So why, when you found out she was

KELLI D. BOTTGER                    01/14/2021

72

1  recording, did you immediately assume that it was for

2  some bad purpose and not simply just so she could

3  remember what you told her?

4              MR. FREIBERGER:  Objection to form.  Go

5       ahead and answer the question.

6       A.  Because she also took written notes during

7  the meeting.  She had a notebook where she wrote down

8  everything.  And so, to me, it didn't make sense, and

9  she had never, prior to working for us in February

10 of 2016, recorded a meeting with staff before.  This

11 was the first time ever.

12      Q.  (By Ms. Parks)  So what did you feel like --

13 why was this alarming to you?

14      A.  Because, one, I have never had a staff member

15 ever record me; two, if you're taking notes, why

16 wouldn't you say, hey, guys, I'm recording this

17 meeting just so I can have notes and go back and

18 revisit my notes.

19      Q.  Okay.  But what -- you said it was alarming

20 to you and you thought you should report it to John

21 Schilling.  Like why?

22      A.  Because it's not customary to have meetings

23 in my line of work where somebody records you and

24 doesn't tell you.

25      Q.  Okay.  So what did you think that meant?

73

1      A.   I think given the history of Maigan's

2   employment and the multitude of instances since

3   February of 2016 where her job performance was not up

4   to par, that it meant she knew she was out of chances,

5   because we had met with her several times and

6   redirected her.

7           In fact, starting in July 13th of 2016,

8   Maigan and I had weekly check-in meetings at

9   10:00 a.m. every Wednesday with only Maigan, no other

10  staff member, because her job performance was not

11  meeting the expectations.  She was not my direct

12  report then, but I felt the need to do that.

13          Then in April of 2018, it became even more

14  apparent that she was not meeting the expectations,

15  and so I started having her do weekly reports so I

16  could see what she was doing.  And that was as a

17  result of multiple times where both Paul and myself

18  had to go back and ask Maigan to redo her time sheets,

19  because there were big chunks of time where she

20  denoted -- that she noted she was emailing and calling

21  principals, et cetera, et cetera.

22          It was also after a meeting that occurred

23  with ACE Scholarships with Arthur Dupre and Maigan and

24  myself on July 20th of 2017, where he gave her

25  11 schools that she was responsible to contact and

74

1    recruit those schools.  That was -- I followed up with

2    her -- from July 20th of 2017.  I followed up with her

3    on July 24th of 2017, September 19th of 2017,

4    October 10th of 2017, October 5th of 2017,

5    November 15th of 2017, June 14th of 2018, and May 22nd

6    of 2018, and to that point, almost a year later, she

7    had not contacted any of those 11 schools.  And that's

8    in a memo that was dated August 15th of 2018 to John

9    Schilling.

10       Q.  Okay.

11       A.  And I'm sure, on these memos, just so there's

12   no discretion, Lindsey Rust, the director of

13   implementation, and Jennifer Miller, the chief

14   financial officers were copied -- I'm sorry.  I didn't

15   read that before.  They were to John Schilling, but

16   just to make sure the record's straight, they were

17   copied on these memos.

18       Q.  This was sent on August 15th of 2018.

19       A.  Yes, ma'am.

20       Q.  Okay.  But you had problems with her work

21   performance as early as July of 2016?

22       A.  Yes, ma'am.

23       Q.  Okay.  Did you ever tell Maigan that you had

24   problems with her work performance?

25       A.  So it depends on the timeline.  On July 13th

75

1   of 2016, I told Lindsey, who was her direct report,

2   that there were issues with her job performance and

3   her understanding of what was required.  And I will

4   say while Maigan was very nice at the beginning,

5   Maigan only ever did what you asked her to do.  She

6   didn't do any additional work, and you had to follow

7   up with her multiple times.  And a lot of times she

8   would ask somebody else on staff to do her job or

9   would give inconsistent, incorrect information.

10          I actually have a text that was submitted

11   where I asked for the average scholarship amount, and

12   she gave me a number that was much lower which

13   couldn't mathematically make sense because, obviously,

14   tuition numbers increase, and her number was lower

15   than the previous year.

16          And so yes.  I had told -- that's a difficult

17   question to answer, because I had told Lindsey, I had

18   told John, and then when Maigan reported to me, I

19   obviously told Maigan herself.

20      Q.  So why didn't you do a memo to everybody like

21   you did in August of '18.

22      A.  I'm sure, and I have not read every single

23   email that was submitted to you, but I know there's

24   been emails where I have told Lindsey at the beginning

25   there was an issue with Maigan.  And Lindsey was well

1  aware there was an issue with Maigan.

2      Q.  So why did you wait two years later to

3  terminate her employment?

4      A.  I didn't terminate her employment.  That

5  wasn't my decision.

6      Q.  Did you recommend it?

7      A.  I don't know that I recommended it.  I --

8  since Maigan was hired, at some point I knew --

9  definitely I can say with fidelity, July 13th of 2016

10  on, I definitely notated to Lindsey and others that

11  there was a lack of job performance.

12      Q.  But not to the extent to where her employment

13  was to be terminated.

14      A.  I don't know that I ever recommended her

15  employment to be terminated.

16      Q.  What did you recommend?

17      A.  I recommended as a former educator to

18  scaffold for her, retrain her, teach her.  Lindsey

19  tried it first; and then eventually in the fall of

20  2017, I took over.  Then I asked Paul to help me, as

21  my deputy state director, like maybe help me

22  communicate in a different fashion than I was.

23          And so we decided to start -- I think he

24  tried for a while, and then we decided to try and

25  start meeting with her together, which is why in 2018,

91

1  they were in the scholarship program or the tax credit

2  with updated information.  So location of the school,

3  the principal, the secretary, because nine times out

4  of ten, it was the secretary that would deal with the

5  parent satisfaction surveys and not the principal.  So

6  she needed both contacts.

7       When she left her job and we took all the

8  emails -- and you should have her spreadsheets,

9  because I think every email exchange between us was

10  provided through discovery.  Those spreadsheets that

11  are contained in those emails when the new person took

12  over, over half the spreadsheet had not been updated

13  since her tenure in 2016.  And the names and contacts

14  were wrong.

15     Q.  Okay.  The new person took over.  What do you

16  mean when the new person took over?

17     A.  So that job title changed, and it became a

18  director of implementation and government affairs to

19  meet the new role of the team.  And when the person we

20  hired to take over implementation and assist with

21  government affairs went and we sent her all of

22  Maigan's spreadsheets, when she went in, over half of

23  it was wrong, and she had to spend multiple days,

24  maybe even a week, redoing all those contacts.

25     Q.  Okay.  What -- where did you get this

92

1   spreadsheet of Maigan's?

2        A.   From Maigan.

3        Q.   Okay.

4        A.   She sent us all her files before she went on

5   maternity leave.

6        Q.   Did you ever -- did anybody ever notice that

7   and say, hey, is this your most recent spreadsheet,

8   because it's not up to date.

9        A.   I'm fairly certain, and you should have the

10  email, in her email she said it was the most up to

11  date, and here was all the updated files.

12       Q.   Who is the new person that was hired?

13       A.   No one.

14       Q.   You just said that when the new person got

15  the spreadsheet, she found out that --

16       A.   And she's not with us anymore.  After COVID,

17  we had a tragic year, and she's not with us, like she

18  no longer works for AFC.

19       Q.   What is her name?

20       A.   Her name is Amy Echols.

21       Q.   Okay.  And when did she come on?  When was

22  she hired?

23       A.   Ooh, I don't know.  I don't know specifics.

24  She resigned this year, though, due to COVID.  We had

25  a tragedy within our team.

KELLI D. BOTTGER                                01/14/2021

93

1      Q.  Okay.  What was that?

2      A.  A death of one of our employees from COVID.

3      Q.  Okay.  Who was that?

4      A.  In April of 2020.  Ed West.

5      Q.  Ed West?

6      A.  Yes, ma'am.  Edward West, Sr.

7      Q.  Where did he work?

8      A.  For AFC.  He was our grassroots coordinator.

9      Q.  Where was he located?

10     A.  In New Orleans.

11     Q.  And he passed away when?

12     A.  April 3rd of 2020.

13     Q.  And why did that lead to -- Amy Echols

14  leaving lead to that?

15     A.  I can't tell you for sure, but we all met

16  together as a team at her house on March 13th.  And

17  prior to that, she had tested negative for the flu but

18  was diagnosed with the flu, spent two weeks deathly

19  ill with high fever, and then from that March 13th

20  meeting, Ed contracted COVID at some point, died on

21  April 3rd.  I have tested positive for the antibodies,

22  so Paul suspects that she probably was misdiagnosed

23  and could have potentially given it to all of us and

24  didn't know.

25          I don't know why she resigned, because it's

KELLI D. BOTTGER                                          01/14/2021

94

1    not my place to ask her.  She just said COVID was a

2    lot, and the passing of Ed, because we are like a

3    family, was a lot for everybody.  And so I can't

4    answer.  That's the timeline of events.

5         Q.  Okay.  But you assume that that had something

6    to do with her decision?  Ed's passing?

7         A.  I kind of do, yeah.  But I can't tell you

8    that for a fact.

9         Q.  So who does her job duties now?

10        A.  I do, Paul does, and Tiffany does.  We've

11   taken on the role of two team members now.

12        Q.  Do you know how long after Maigan was

13   terminated that Amy was hired?

14        A.  I don't.

15        Q.  Do you know if it was a year or three months?

16   Some sort of ballpark?

17        A.  It wasn't a year.

18        Q.  Okay.

19        A.  I don't know how many months, but it wasn't a

20   year.

21        Q.  Okay.  And what duties did she have?

22        A.  Implementation, but at the time, the

23   implementation role, and even in 2018 that role, was

24   starting to shrink because our current governor does

25   not believe in school choice; and so our programs