```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3                         NEW ORLEANS DIVISION

 4

 5   MAIGAN FRANCIS              :     CIVIL ACTION NO.
                                 :     5:19-CV-14315
 6                               :
     VERSUS                      :     SECTION: A/2
 7                               :
                                 :
 8   AMERICAN FEDERATION         :     DISTRICT JUDGE JAY C.
     FOR CHILDREN, INC.          :     ZAINEY
 9

10

11

12

13

14

15

16

17

18

19            REMOTE DEPOSITION OF JOHN SCHILLING
                      January 15, 2021
20

21

22

23   Stenographically Reported by:
     Karen Tyler, CCR(LA), CSR(TX), TCRR, CRR, CRC
24   Registered Diplomate Reporter
     Notary Public
25
```

1  REMOTE APPEARANCES:

2      COUNSEL FOR PLAINTIFF:

3      LANGLEY & PARKS, LLC
       BY:        JULIANNA P. PARKS, ESQUIRE
4                 jparks@langleyparks.com
       401 Market Street, Suite 1100
5      Shreveport, Louisiana  71101
       318.383.6422
6      318.383.6405 - Facsimile

7      COUNSEL FOR DEFENDANT:

8      CENTRE LAW & CONSULTING, LLC
       BY:        TYLER J. FREIBERGER, ESQUIRE
9                 tfreiberger@centrelawgroup.com
       8330 Boone Boulevard
10     Vienna, Virginia  22182
       703.288.2800
11

12     ALSO PRESENT:  Ms. Maigan Francis

13

14

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

S T I P U L A T I O N S

      The remote deposition of JOHN SCHILLING, taken by counsel for Plaintiff, Ms. Julianna P. Parks, pursuant to Notice and agreement by and between counsel, for all purposes as allowed by the Federal Rules of Civil Procedure, before Karen Tyler, Certified Court Reporter, with the parties being in Louisiana and Virginia on January 15, 2021.  It being stipulated by and between counsel that all formalities, with the exception of the swearing of the witness, are waived.

      It being further stipulated that the reading and signing of the deposition are waived by counsel and by the witness.

      It being further stipulated that all objections, except as to the form of the question and responsiveness of the answer, are reserved until the time of trial.

///
///
///
///
///
///

1  build their own teams, manage their own teams, because
2  they are closest to the work.
3          And so I felt like, you know, we should
4  provide some deference to the state director and, you
5  know, who they wanted to hire for particular positions
6  that we had agreed were necessary.
7       Q.  Okay.  Back to the decision in October
8  of 2018 to terminate Ms. Francis's employment, can you
9  tell me how that decision was made?
10      A.  It was made because, as I indicated, we had
11 had a lot of discussions over the course of 2018 about
12 the decline in performance and about the fact that
13 we -- we really didn't think that we needed a
14 full-time implementation director.  It really all came
15 to a head at the end of October where we just
16 determined that that was really the time that we
17 needed to move on.  There was consensus among team
18 members, Kelli, Paul, Lindsey; our Louisiana
19 Federation for Children president, Ann Duplessis --
20 everybody was in agreement with the decision.
21 Ultimately, you know, I have to make the final
22 decision about these things; and, you know, weighing
23 the evidence and recognizing the decline in
24 performance and recognizing that I felt we really
25 didn't need somebody solely devoted to implementation

1  work, I felt that this was the right thing to do for
2  the organization.
3       Q.  So what was the main reason?  Was it because
4  decline in performance and everything came to a head
5  or because you no longer needed the position?
6       A.  Both.
7       Q.  So 50/50?
8       A.  It's hard to put a percentage on it, but they
9  were both -- the two -- they were both the two
10 factors.
11      Q.  So they were equally important in the
12 decision?
13      A.  I would say that they were both important.
14 Were they of equal weight?  Probably, you know -- I
15 don't know if they were of equal weight.  They were
16 both critical to the decision.  But look.  I mean,
17 it's -- you know, as the president of the
18 organization, I can't -- it's very important for me
19 to -- you know, to be able to say to our board and to
20 our donors, you know, that -- you know, that everybody
21 in the organization is doing great work -- and that
22 we're not -- and that we're being good stewards of the
23 resources of the organization.
24           So, you know, I was faced with an employee
25 whose performance had declined considerably over 2018,

1  and I was faced with the reality that we really didn't
2  need a full-time implementation director.  Those were
3  really the two -- those were the two reasons.  It's
4  very hard to say it was 60 percent this or 40 percent
5  this.  You know, they were both.
6       Q.   Understood.  Okay.  How did you determine
7  that her performance had declined significantly in
8  2018?
9       A.   Through numerous conversations with Kelli
10 over the course of the year.
11      Q.   Okay.  So all of this information came from
12 Kelli?
13      A.   I would not say it all came from Kelli.  I
14 also had a lot of conversations with Paul.  I had less
15 conversations with Lindsey about Maigan in 2018
16 because Lindsey was no longer involved in the
17 supervisorial capacity.
18      Q.   Okay.  What specifically -- you've described
19 some overall performance issues with Maigan.  How did
20 they decline in 2018, meaning what was different about
21 that in 2018 than 2017?
22      A.   So I think it was an issue of some of the
23 things that required attention in 2016 and 2017 just
24 getting worse.  You know, there's -- you know,
25 Louisiana is a very important state to the

1  organization. We've been invested in Louisiana for a
2  very long time. You know, things move at a pretty
3  quick pace in Louisiana, and, you know, my sense of it
4  was that the things over the course of '16 and '17
5  just began to get much worse in 2018.
6        You know, we need everybody on the team, you
7  know, to be pulling their own weight, to be taking the
8  initiative; and so if there's one person on the team
9  that requires significantly more attention or
10 direction, you know, it kind of -- it prevents other
11 members of the team from doing the things that they
12 need to do in their own jobs.
13       So that was the general sense that I was
14 getting throughout the course of 2018. It was just
15 this lack of initiative, lack of being a self-starter,
16 some specific issues with communication with the state
17 Department of Education, Kelli complaining that Maigan
18 was not doing the things she was being asked to do.
19 It was -- it's a sort of -- it was just building over
20 the course of the year.
21    Q.  Okay. Is Kelli Paul's supervisor?
22    A.  Yes.
23    Q.  Okay. How did your conversations -- I
24 believe you said that Kelli would contact you with
25 issues she was having with Maigan; is that a fair

1  statement?
2      A.  Yes.
3      Q.  Did Paul ever contact you and say, I'm having
4  issues with Maigan?
5      A.  Paul did not contact me.  He did not
6  unilaterally reach out to me and say that he was
7  having issues.  But I had visited Louisiana once,
8  maybe twice, in 2018, and I had had conversations with
9  Paul.  Just normal check-ins where -- initiated by me
10 where I just said, you know, how are things going,
11 and, you know, how's this going, how's that going.
12 And that's when this would come up.
13     Q.  Did you ever contact Paul and ask him if he
14 was having problems with Maigan Francis?
15     A.  I don't know that that was ever the express
16 purpose of any contact that I had with Paul, but in
17 the course of my conversations with him about how the
18 work was going in Louisiana, this would occasionally
19 pop up.
20     Q.  Do you remember specifically what his
21 complaints were about Maigan Francis?
22     A.  That he was having to spend an extraordinary
23 amount of time, you know, hand-holding on certain
24 issues.
25     Q.  Do you remember what those certain issues

1  something that only one person needed to attend.
2  That's my recollection.
3      Q.  Okay.  So that's where I think there is a
4  disconnect is that was it because someone else
5  attended or was it because someone else registered?
6  From your memory, and if you don't know, then that's
7  fine.
8      A.  Yeah.  All I remember is that I remember that
9  Kelli saying that this had been an issue because she
10 had asked Maigan to do something one way.  It was done
11 another way.  And then my recollection is, is that two
12 people ended up going to this, and the team ended up
13 expending the resources to have two people go to this
14 when one person should have gone.  That's -- that's my
15 recollection.
16     Q.  Okay.  From your recollection, did Kelli
17 alert you to this issue after the conference had taken
18 place?
19     A.  That is a level of detail that I cannot
20 remember.
21     Q.  Okay.  Because when you just said the --
22     A.  I imagine it was after.  I -- you know, I
23 just don't know.  I can't -- I can't -- I can't get
24 down to that level of detail.
25     Q.  Okay.  All right.  One more question about

1    your response earlier when you said that you had
2    determined that everyone was in agreement that a
3    change needed to be made.  And by "everyone," I
4    believe you listed Ann Duplessis?
5         A.   Uh-huh.
6         Q.   Is that -- did I write that down incorrectly
7    or did you say that?
8         A.   I did say that.
9         Q.   Okay.  Who else?  Obviously Kelli.
10        A.   Paul.
11        Q.   And Lindsey, because we've already talked
12   about them.  And Paul.  Was there anybody else that
13   you meant when you said everyone was in agreement?
14        A.   No.  I mean, those were the ones, and those
15   were the ones who had worked -- those were the ones
16   with whom Maigan worked most closely.  But obviously,
17   you know, over the course of the year, I had
18   conversations with our CFO, Jennifer Miller.  I had
19   conversations with our CEO, Greg Brock.  You know,
20   just -- just to let them know about, you know, what
21   was happening.  But, you know, ultimately neither one
22   of them are involved in the day-to-day work, and
23   ultimately, the decisions about the staff are left to
24   me.
25        Q.   Okay.  Of those people -- and let's start

1    Q.  Did she ever tell you about that?
2    A.  We talked about team performance occasionally
3  when I would go down to Louisiana.  I did not have
4  regular calls with Ann in 2016 and 2017 and 2018 about
5  specific teamwork.
6        I do recall -- typically when I would see Ann
7  is when I would actually go to Louisiana.
8    Q.  Did Ann ever report to you any problems that
9  she had witnessed with Maigan Francis?
10   A.  I do not recall Ann reaching out to me
11 individually to report problems with Maigan, but I do
12 recall in the course of our conversations her noting
13 that she knew that there had been some issues.
14   Q.  Did she tell you how she knew that?
15   A.  Well, again, I believe Ann participated on
16 most of the weekly calls.  And so I gather that's
17 where she got that information.  Or she got it from
18 Kelli and Paul separately.
19   Q.  Okay.  Did she tell you what problems with
20 Maigan Francis that she had observed?
21   A.  I don't recall anything specific that she
22 said to me about problems that she had observed.  It
23 was more about problems she was aware of.  I just
24 don't know the answer to that.
25   Q.  Okay.  So as far -- what I'm trying to figure

1  out is you said that everyone was in agreement that a
2  change needed to be made, and we've talked about
3  everybody who was in agreement.  And so what I'm
4  trying to determine is who reported to you -- I
5  understand that everybody said a change needed to be
6  made.  I understand that.  Were you just relying on
7  their evaluation of that or did you ask them
8  specifically, tell me why a change needs to be made.
9       A.   Oh, absolutely.  We talked it through at
10 length about why a change needed to be made.
11           I simply didn't take their recommendation,
12 hey, we need to make a change here, without asking any
13 questions.  We talked about it a lot.
14      Q.   Okay.  So who provided to you the information
15 regarding the performance issues?
16      A.   Well, as I've indicated, over the course of
17 2018, I had a lot of conversations with Kelli about
18 performance issues.  I had a lot of conversations with
19 Kelli about whether we really needed a full-time
20 implementation director in the states.  I had
21 infrequent conversations with Paul Dauphin where this
22 would come up.
23           I had, you know, one-off conversations with
24 Lindsey because she was still -- while she wasn't
25 supervising Maigan, as our national director of

61

1  implementation, she monitored implementation work in
2  all of our states.  So most of the information that I
3  received about performance and the recommendation that
4  we really didn't need a state director of
5  implementation was from Kelli.
6      Q.  Okay.  So other than Kelli, and I believe you
7  said Paul had mentioned some issues, did any of these
8  other people have firsthand knowledge of performance
9  issues with Maigan that they reported to you?
10     A.  So when you say reported to me, like this
11 isn't just --
12     Q.  I don't want you to guess whether Ann had
13 ever witnessed anything that she felt was a
14 performance issue with Maigan.
15     A.  Uh-huh.
16     Q.  I just want you to tell me if she ever told
17 you about it.
18     A.  I would say that in the course of
19 conversations that I had had with Ann, she was aware
20 that there were problems with Maigan.
21     Q.  Okay.  But you don't know if she was aware
22 because Kelli or Paul told her or if she had
23 personally witnessed it.
24     A.  I -- that is correct.
25     Q.  Okay.  And would that be the same for

1   Thanks, Maigan, for her good work in 2017 and our
2   appreciation.
3           I think that's self-explanatory.
4           Talked about LA team dynamics and how they
5   have changed this year.
6           So is it your testimony that that sentence
7   advises her of problems with the team?
8        A.  Well, keep in mind that this evaluation
9   reflects my notes of the conversation.  So the
10  conversation itself expounded upon these things more
11  than what is indicated right here.  But when I look at
12  that sentence, that's talking about Louisiana team
13  dynamics; and by dynamics, it's the communication
14  within the team.
15       Q.  Okay.  So by this sentence, does that, to
16  you, say that when you talked with Maigan that you
17  explained to her that there were problems with the
18  team dynamics and that she needed to improve upon
19  those?
20       A.  When I look at that, it's simply relaying
21  that there were some challenges with team dynamics.
22       Q.  Okay.  So in addition to changes, there were
23  challenges.  This says changed.  What do you mean by
24  changed?
25       A.  Well, the team dynamics changed in the sense

1   that over the course of 2017, you know, we had gone
2   from Lindsey Rust being Maigan's supervisor to Kelli
3   supervising her.
4           We were also -- my recollection is we might
5   have been making some changes in the grassroots area
6   as we were heading into 2018 as well.
7       Q.  Okay.  But this sentence of this note
8   indicates to you that you talked with Maigan regarding
9   improvements that she needed?
10      A.  Yes.  I'm sure that I referenced that -- you
11  know, that there were some challenges.  But again,
12  keep in mind, these are notes of our conversation.
13      Q.  Okay.  Report was that communication within
14  the team was better.
15      A.  Correct.
16      Q.  So that is to alert Maigan of issues with her
17  performance?
18      A.  Well, the report that communication within
19  the team was better indicates that that was an area of
20  improvement; that team communication had, in fact,
21  improved.
22      Q.  Okay.  Talked about the work with the schools
23  and some of the challenges, given that we are unlikely
24  to be able to secure legislative changes to the
25  voucher program before the next gubernatorial

1    election.
2            Tell me what, to you, that note indicates
3    regarding your conversation with Maigan.
4        A.  It's an indication of something that required
5    some attention because, as I have indicated over the
6    course of -- over the course of the deposition, you
7    know, one of the areas of challenge was, you know,
8    building the relationships with schools and getting
9    more schools to join the program.  That was an area
10   that needed some attention.
11           And this sentence reflects that we discussed
12   that.
13       Q.  Okay.  So it says, talked about the work with
14   the schools.  Okay.  Some of the challenges given we
15   were unable to secure legislative changes to the
16   voucher program before the next gubernatorial
17   election.
18           How did -- that, to me, when I read it, says,
19   given we aren't able to secure changes to the program
20   before the election.  How is that something that
21   Maigan is responsible for?
22       A.  Maigan was not responsible for securing
23   legislative changes, but part of her responsibility
24   was building relationships with schools, making sure
25   that schools understood the differences in the various

1  programs.  There were some schools that were
2  participating in the Louisiana Scholarship Program,
3  some schools that were participating in the Louisiana
4  tax credit program.  And, of course, we had an
5  interest in getting more schools to want to join the
6  program.
7       Q.  Okay.
8       A.  So Maigan had nothing to do with, you know,
9  generating or creating legislative change.  It was
10 really the relationship with the schools.
11      Q.  So why did you put that in her performance
12 evaluation?
13      A.  It was simply noting that there were going to
14 be challenges given that we were not able to secure
15 the legislative changes.  This would change the nature
16 of how she was communicating with the schools, and it
17 was an opportunity for me, you know, to say that, you
18 know, building relationships with schools remained
19 important.
20      Q.  Okay.  But is the reason that you reference
21 changes to convey to her that it's going to be more
22 important now?  I'm not understanding how the changes
23 are relevant to Maigan's performance.
24      A.  Well, again, these are the notes of my
25 conversation with her; so --